IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JANE DOE 4, | CIVIL ACTION FILE |
| Plaintiff, | NO. 1:19-cv-03845 |
| v. | JURY TRIAL DEMANDED |
| RED ROOF INNS, INC., FMW RRI NC, LLC, RED ROOF FRANCHISING, LLC, RRI WEST MANAGEMENT, LLC, VARAHI HOTEL, LLC, WESTMONT HOSPITALITY GROUP, INC., HSI CHAMBLEE, LLC, SUB-SU HOTEL GP, LLC, WHG SU ATLANTA, LLC, WHG SU ATLANTA LP, CC&S DEVELOPMENT, LLC, ESSEX, LLC, AND KUZZINS BUFORD, LLC, | Pursuant to Fed. R. Civ. P. 38 |
| Defendants, | |

## SECOND AMENDED COMPLAINT

## **TABLE OF CONTENTS**

THE PARTIES ................................................................................................2

  Smyrna Red Roof ........................................................................................2

  Suburban Extended Stay...............................................................................4

  Microtel .......................................................................................................5

JURISDICTION & VENUE ...........................................................................6

FACTUAL ALLEGATIONS............................................................................6

  I.    THE SMYRNA RED ROOF ...............................................................6

    A. The Trafficking of Jane Doe 4 at the Smyrna Red Roof ...................6

    B. The Smyrna Red Roof Defendants .................................................21
      1.  The Corporate Relationship between Westmont and
          Red Roof Inns, Inc.................................................................22
      2.  Owners and Franchisees of the Smyrna Red Roof .....................26
      3.  Managers of the Smyrna Red Roof ...........................................27
      4.  The Smyrna Red Roof Franchisor.............................................29

  II.    THE SUBURBAN EXTENDED STAY................................................32
    A. The Sex Trafficking of Jane Doe 4 at the Suburban
      Extended Stay .................................................................................32

    B. The Suburban Extended Stay Defendants.......................................42
      1.  Owners of the Suburban Extended Stay................................43
      2.  Manager of the Suburban Extended Stay ……….. ...............46

  III.    THE MICROTEL INN & SUITES ......................................................47

    A. The Sex Trafficking of Jane Doe 4 at the Microtel ........................47

**B. The Microtel Defendants** ...................................................................**53**

    **1. Owners of the Microtel** .......................................................**55**

    **2. Managers of the Microtel** .................................................**55**

    **3. The Microtel Defendants are Agents of CC&S** .......................**55**

**COUNTS** ..................................................................................................**58**

**Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act (Allegations Common to Counts I–II, V–VI, IX–X)** ....................................**58**

    **A. Acts of Racketeering Activity** ...........................................**58**

        **i.    Sex Trafficking in Violation of Federal Law** .....................**58**

        **ii.   Sex Trafficking in Violation of State Law… …………...   58**

        **iii.  False Imprisonment** .......................................................**60**

        **iv.  Battery** ............................................................................**61**

        **v.    Keeping a Place of Prostitution** ....................................**62**

        **vi.  Pimping** ..........................................................................**63**

    **B. The Acts of Racketeering Activity Formed a Pattern** ...................**64**

**COUNT I – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)** ...........................................................................................**66**

**COUNT II – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)** ........................................................................................**68**

**COUNT III – TVPRA, 18 U.S.C. § 1595 (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)** ..........................................................................................**70**

**Direct Liability** ......................................................................................**70**

**Agency Liability** ....................................................................................**75**

**Alter Ego/Mere Instrumentality** ........................................................................**75**

**Joint Venture** ..................................................................................................**77**

**Damages** .........................................................................................................**78**

**COUNT IV – Negligence (Against the Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)** ......**79**

**COUNT V – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against Suburban Extended Stay Defendants:  HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** .................................................................................................**85**

**COUNT VI – Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** ................................**88**

**COUNT VII – TVPRA, 18 U.S.C. § 1595 (Against Suburban Extended Stay Defendants:  HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** .................................................................................................**89**

**Direct Liability** ...............................................................................................**90**

**Agency and Alter Ego** ......................................................................................**92**

**Damages** .........................................................................................................**93**

**COUNT VIII – Negligence (Against the Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** ................................................................................................**94**

**COUNT IX – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against Microtel Defendants: Kuzzins, CC&S, and Essex)** .........................................................**99**

**COUNT X – Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against Microtel Defendants: Kuzzins, CC&S and Essex)** ......................................................102

**COUNT XI – TVPRA, 18 U.S.C. § 1595 (Against Microtel Defendants:  Kuzzins, CC&S, and Essex)** .....................................................103

**Direct Liability** .................................................................................104

**Agency and Alter Ego** ......................................................................105

**Damages** ...........................................................................................107

**COUNT XII – Negligence (Against the Microtel Defendants: Kuzzins, CC&S, and Essex)** ..........................................................107

COMES NOW Plaintiff in the above-styled action and hereby files her Second Amended Complaint as follows:

1.      From 2010 to 2013, Plaintiff Jane Doe 4 was trafficked at hotels around Atlanta.  Sold for commercial sex out of Defendants' hotel rooms, Jane Doe 4 files this lawsuit against three hotels that profited from her trafficking.

2.      These Defendants maintained hotel properties where criminal conduct was rampant, open, and obvious.  They fostered an environment that made them ideal venues for the sex trafficking ventures that victimized Jane Doe 4.

3.      For years, while being trafficked out of the Smyrna Red Roof Inn, the the Suburban Extended Stay and the Microtel Inn & Suites, Jane Doe 4 was tortured, beaten, drugged and raped at those locations.

4.      And even after these Defendants had every reason to know about the prevalence of sex trafficking at their hotels, the relationship between pimps, prostitution, and trafficking, and the sex trafficking ventures involving Jane Doe 4 and others at their hotels, they continued to profit from the rent traffickers paid to facilitate Jane Doe 4's trafficking and victimization.

5.      Jane Doe 4 seeks to hold these Defendant hotels liable under the Trafficking Victims Protection Reauthorization Act, the Georgia Racketeer and Influenced and Corrupt Organizations Act, and for negligence.

1

# THE PARTIES

6.    Jane Doe 4, proceeding pseudonymously,[1] is a citizen of the United States of America and a resident of the State of Tennessee.

## Smyrna Red Roof

7.    FMW RRI NC, LLC ("FMW") is a Delaware limited liability company with its principal place of business in Houston, Texas. FMW may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

8.    Red Roof Franchising, LLC ("Red Roof Franchising") is a Delaware limited liability company with its principal place of business in New Albany, Ohio. Red Roof Franchising may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, GA 30092, USA.

9.    Red Roof Inns, Inc. ("RRI") is a Delaware corporation with its principal place of business in New Albany, Ohio.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia, and outside of Georgia resulting in injuries in Georgia.  RRI may be served

---

[1] Protective Order, Doc. 92.

with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

10.    RRI West Management, LLC ("RRI West") is a Delaware limited liability company with its principal place of business in Houston, TX. RRI West may be served with process by serving its registered agent Capitol Services, Inc. at 1675 S State St. Suite B, Dover, DE 19901.

11.    Varahi Hotel, LLC ("Varahi") is a Georgia limited liability company with its principal place of business at 2200 Corporate Plaza, Smyrna, Georgia, 30080.  Vahari may be served with process by serving its registered agent Bharat Patel at 2200 Corporate Plaza, Smyrna, Georgia, 30080.

12.    Westmont Hospitality Group, Inc. ("Westmont") is a Texas corporation with its principal place of business in Houston, Texas.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Westmont may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas, 78701.

13.    Collectively, Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West are the "Smyrna Red Roof Defendants."

3

**Suburban Extended Stay**

14.    HSI Chamblee, LLC ("HSI") is a Georgia limited liability company with its principal place of business in Amelia Island, Florida.  HSI may be served with process by serving its registered agent, Ray Orton at 1075 Hunters Brook Court, Atlanta, Georgia, 30319.

15.    SUB-SU Hotel GP, LLC ("SUB-SU") is a Delaware limited liability company with its principal place of business in Houston, Texas.  SUB-SU is a general partner of WHG SU LP and is liable for the debts of WHG SU LP.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  SUB-SU may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 515 East Park Avenue, 2nd Floor, Tallahassee, Florida, 32301.

16.    WHG SU Atlanta, LLC ("WHG SU LLC") is a Delaware limited liability company with its principal place of business in Houston, Texas.  WHG SU LLC may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth, Georgia, 30096.

17.    WHG SU Atlanta LP ("WHG SU LP") is a Delaware limited

4

partnership with its principal place of business in Houston, Texas. WHG SU LP may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth, Georgia, 30096.

18.     Collectively, HSI, SUB-SU, WHG SU LLC, and WHG SU LP, together with Westmont, are the "Suburban Extended Stay Defendants."

### Microtel

19.     CC&S Development, LLC ("CC&S") is a Massachusetts limited liability company with its principal place of business in Needham, Massachusetts. CC&S may be served with process by serving its registered agent Wayne A. Swartz, 300 First Avenue, Suite 332, Needham, MA 02494.

20.     Essex, LLC ("Essex") is a New York limited liability company with its principal place of business in Rochester, NY. Essex may be served with process by serving its registered agent Incorporating Services, Ltd at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA, 30076.

21.     Kuzzins Buford, LLC ("Kuzzins") is a Georgia limited liability company with its principal place of business in Needham, Massachusetts. Kuzzins may be served with process by serving its registered agent Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

22.    Collectively, CC&S, Essex, and Kuzzins are the "Microtel Defendants."

23.    For all Defendants and Defendant groups, whenever reference is made in this complaint to any act, deed, or conduct of a Defendant's agents, employees, or representatives, the allegation is that the agent, employee, or representative was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

## JURISDICTION & VENUE

24.    This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under 18 U.S.C. 1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims form part of the same case or controversy as her federal law claims.

25.    Defendants are subject to personal jurisdiction in this district and division.

26.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## FACTUAL ALLEGATIONS

## I.    THE SMYRNA RED ROOF

### A.    The Trafficking of Jane Doe 4 at the Smyrna Red Roof

27.    From about 2010 to 2012, Jane Doe 4 was trafficked out of hotel rooms at the Smyrna Red Roof, a Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia 30080 ("Smyrna Red Roof").  Jane Doe 4 was trafficked out of the Smyrna Red Roof on multiple times by different traffickers.

28.    When she was trafficked out of the Smyrna Red Roof, Jane Doe 4 was forced to have sex with around 10 men per day.  The foot traffic of men to the hotel room in which Jane Doe 4 stayed evidenced trafficking.  Jane Doe 4 also witnessed other trafficking victims at the Smyrna Red Roof and was trafficked there with Jane Doe 3, among others.

29.    Smyrna Red Roof employees actively assisted Jane Doe 4's trafficker by calling their hotel room to warn them if law enforcement was on-site or en-route or if the volume of foot traffic to and from rooms was drawing unwanted attention or guest complaints.

30.    At a point in time, most of the Smyrna Red Roof's business came from traffickers renting hotel rooms.  There were 10–12 different traffickers staying at the Smyrna Red Roof at the same time, with some traffickers controlling 4–5 victims at a time at the hotel.  The Smyrna Red Roof was full of girls hanging over balconies to advertise, and traffickers directing commercial sex buyers to hotel rooms.  Commercial sex buyers were present regardless of the time of day.  There were often more than 100 buyers at the

hotel in a single day.  Hotel employees also saw traffickers openly beat

victims in the public parking lot.

31.     The Smyrna Red Roof did not attempt to disguise the bustling sex trade

taking place on its property.  Instead, it prominently displayed a sign at the

front desk and night window reading: "NO REFUNDS AFTER 15

MINUTES."

 

32.     The "NO REFUNDS AFTER 15 MINUTES" sign was posted for many

years up and through the initial filing of this lawsuit.  It also featured

prominently in numerous publicly available online reviews and would have

been obvious to anyone on-site, including those charged with auditing and

inspecting the property on behalf of Westmont and RRI.

33.    The "NO REFUNDS" sign evidenced both that the Smyrna Red Roof was aware of the reason for the traffic at the property (trafficking in commercial sex) and that the trafficking stays were likely to be brief.

34.    Smyrna Red Roof employees routinely found "blood everywhere," and numerous condoms in rooms.  This was true of the rooms where Jane Doe 4 and Jane Doe 3 stayed while at the Smyrna Red Roof.  Their room evidenced numerous well-known and visible signs of sex trafficking.  Frequently, the trash cans in the rooms contained an extraordinary number of used condoms.

35.    The rooms also contained more cell phones than registered occupants.

36.    Though RRI policy required hotel staff to physically enter a room at least every three days, RRI did not follow its own policy.  While Plaintiff was being trafficked at the Smyrna Red Roof, housekeeping frequently failed to enter her room for weeks at a time.

37.    In addition to the condition of the room in which she stayed, to anyone who saw Jane Doe 4, her outward physical appearance often reflected bruises, a busted lip, or other evidence of physical beatings by her trafficker. Her physical appearance suggested malnourishment, poor hygiene, fatigue, sleep deprivation, and evidence of deterioration—all well-known signs of trafficking.  Her failure to make eye contact with others, lack of control, lack

of money, and monitoring by her traffickers also were well-known signs that she was a trafficking victim.

38.    Jane Doe 4's physical condition was apparent to the Smyrna Red Roof employees and to anyone with whom she interacted during her stays on the property, where she and other victims with her regularly requested an excessive amount of towels and bed linens—still more well-known signs that Jane Doe 4 was a victim of sex trafficking.

39.    Additionally, a RRI employee observed that the sex trafficking ventures operating at the Smyrna Red Roof tried to control the commercial sex business there.  For example, the RRI employee noticed that any prostitute that tried to work independently—without a trafficker—was either chased off the property by traffickers or was forced to work for them.

40.    The illegal commercial sex trade and open trafficking were so obvious that not one, but two websites were devoted to warning about the drug activity, prostitution, and sex trafficking at the Smyrna Red Roof.

41.    The first website, "Red Roofie Blog," warned of drug activity and prostitution at the Smyrna Red Roof and warned travelers (especially families) not to stay at the hotel.[2]

---

[2] Red Roofie Blog: Avoid Red Roof Inn Smyrna Georgia.
http://redroofie.blogspot.com/p/reviews.html (last visited May 7, 2020).

42.     The second website, www.atltrafficking.com ("ATLTrafficking"),
highlighted instances of sex trafficking at hotels in Atlanta and wrote more
articles about the Smyrna Red Roof than any other hotel in the city.

43.     ATLTrafficking specifically identified by name and photograph
traffickers staying at the Smyrna Red Roof and quoted an employee (a)
"admit[ing] that much of the information contained in" an article published
on the site "regarding sex trafficking occurring in their rooms is true" and (b)
"confirm[ing] that the national Red Roof Corporate office is aware of the
situation, as well as the franchise owner."

44.     ATLTrafficking published an article that posed the question: "What
will it take for Red Roof Corporate (614-744-2600) to pull the franchise rights
from this owner?"  The article suggested that "Concerned citizens should call
the Cobb County elected officials as well as the Red Roof Corporate offices
right away," and provided contact information for RRI, its communications
department, and its public relations agency.

45.     ATLTrafficking published another article about the Smyrna Red Roof
that stated, among other things:

    a.     "Any day of the week, dozens of girls are trafficked out of this
           location, some of whom look underage, even as young as 12." and;

11

b.   "Private investigators recently observed a young woman being

trafficked repeatedly at the Red Roof in Smyrna over a 3

day period while her 7 week old baby slept at the foot of the bed

in which she was entertaining 'client' after 'client.'"

46.   The highest level corporate employees at RRI were directly informed of

the conditions at the Smyrna Red Roof.  This included knowledge of the sex

trafficking venture that victimized Jane Doe 4.

47.   In 2015, a hospitality industry executive and anti-trafficking advocate

sent these articles directly to Andrew Alexander, RRI's president and CEO.

She spoke with Mr. Alexander on the phone and told him of the rampant and

ongoing commercial sex trafficking occurring at the Smyrna Red Roof.

48.   Specifically, the hospitality industry executive identified a suspected

trafficker who was listed on the Georgia Sex Offender Registry and who had

a lengthy criminal history of sex crimes involving minors.  This man

trafficked another trafficking victim, Jane Doe 1 at the Smyrna Red Roof.

Some of Jane Doe 1's traffickers and Jane Doe 4's traffickers were associates

and part of the same sex trafficking venture. The executive told Mr.

Alexander this was "[o]ne example of Red Roof Inn appearing to be involved

in trafficking."

49.    Mr. Alexander's only response was to have RRI's general counsel,
George Limbert, call the executive to find out who ran the website where the
articles were published.

50.    The executive then sent Mr. Limbert the same information previously
sent to Mr. Alexander and asked when the company would take action to
address the open sex trafficking at the Smyrna Red Roof.

51.    Finally, weeks after her first communication with Mr. Alexander, the
hospitality industry executive emailed Mr. Alexander again, copying the
company's general counsel, Mr. Limbert, and alerting them that the
previously identified trafficker appeared to be living above the Smyrna Red
Roof's manager's office.

52.    Among other things, the email reported that the trafficker "was seen
outside your manager's office last night [at the] Red Roof Inn mentioned in
the report [the Smyrna Red Roof].  His background is very clear[,] and he
appears to be using your hotel regularly and is quite friendly with your
manager. . . . I hope Red Roof takes action on this sad situation."

53.    In addition to the direct knowledge of RRI's highest executives, the
conditions at the Smyrna Red Roof were obvious to anyone, including the
other Red Roof Inn employees and agents who visited the property during the
time Jane Doe 1 was trafficked there.

54.     Jay Moyer, Vice President of Operations for RRI, regularly visited the Smyrna Red Roof to inspect the hotel and discuss the hotel's revenue and performance.  He frequently stayed for 2–3 nights, several times each year. The trafficking activity described above was rampant and known to Mr. Moyer—who eventually refused to stay overnight at the hotel because of it.

55.     Sometime in 2011–2012, Cobb County police notified the then-general manager of the Smyrna Red Roof that sex traffickers had paid a former general manager and a then-current employee to act as "look outs."

56.     Numerous arrests and investigations also provided all the Smyrna Red Roof Defendants with notice of sex trafficking ventures operating at the Smyrna Red Roof.

    a.     A December 2010 prostitution sting conducted by the Metro Atlanta Child Exploitation Task Force and the Marietta Police Department, during which law enforcement rescued a 16-year-old trafficking victim;[3]

---

[3] Katy Ruth Camp, *Six Women Arrested in Prostitution Sting,* Marietta Daily Journal (Dec. 22, 2010), www.mdjonline.com/news/six-women-arrested-in-prostitution-sting/article_a1a08727-b64a-5b5f-8b67-5b38927d16b9.html (last visited May 7, 2020).

b.     A March 2011 Cobb County Police arrest report remarking that the "location is known for problems with drugs and prostitution" and was a "hotbed of illegal activities";

c.     A July 2011 report of theft at the hotel, in which the victim reported that "a pimp and a prostitute" stole her property "because she refused to work for [the pimp]";

d.     Police responding to a dispute between a guest and a Smyrna Red Roof  Inn employee at the hotel in April 2012 that arose because the hotel refused to refund a guest after he demanded that the hotel return his money because, among other things, he was "harassed by prostitutes" while there; and

e.     A December 2014 arrest of a man, charged with buying sex from a 16-year old trafficking victim and then grabbing the girl by her hair, dragging her to the room's bathroom, and attempting to drown her in the bathtub.[4]

57.     Online review also provided the Smyrna Red Roof Defendants with

---

[4] *See, e.g.,* Police: Marietta Man Tried to Kill 16-year-old, Marietta Daily Journal (Dec. 16, 2014), https://www.mdjonline.com/news/police-marietta-man-tried-to-kill--year-old/article_1ef10907-7df1-53d3-bb4a-37038e97cc0f.html (last visited May 7, 2020).

notice of the foreseeable risk of sex trafficking ventures at the Smyrna Red Roof.  Through the relevant time period, RRI actively monitored online reviews on a daily basis.  For example, RRI currently represents that "our president receives all of our Tripadvisor Reviews to his email daily."

58.    Publicly available online reviews of the Smyrna Red Roof, reported widespread prostitution and crime at the hotel, including:[5]

    a.    A July 7, 2013 review, stating:

        **Prostitutes everywhere** . . . . There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window.  It was hard to sleep to say the least.  The only security I felt was the fact our dog was with us.  Don't stay here!!!

    b.    A May 17, 2016 review, stating:

        Ok to start do not stay here. . . . **There were drug dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises.** ... The 1st day of me checking in I found blood on the bathroom door, walls and floor.

59.    In some cases, Bharatkumar Patel, a member of Varahi Hotel LLC and manager of the Smyrna Red Roof, responded to the online reviews, thereby confirming that the Smyrna Red Roof Defendants actually knew of

---

[5] Emphasis, where present, is added.

commercial sex acts at the location and, at a minimum, should have known of the commercial sex trafficking occurring there.

60. Among other reviews to which Mr. Patel responded were:[6]

a. An August 12, 2014 review, stating:

> **PROSTITUTION – COCK ROACHES – AND DOG POOP!** Deluxe ROOM
> DO NOT GO THERE!!!!! My worst experience ever! Saw prostitution, dogs pooping outside, loitering, dead cockroaches in my room.  I askd thm 2 come get it up th clerk said he could "bring me a broom!"[] NOT! . . . I wouldn't send my enemy here! Unless you want crackheads and prostitutes and don't mind . . . .

In response, Mr. Patel wrote:

> I am wrinting deep apology for prostitution came in our property. I just hire new security person for watch night for any one who make any kind of problem.this will not happen again.

b. But a review from August 8, 2015, one year later, confirms nothing had changed:

> DO NOT stay here! . . . **There were shady people hanging out outside of our room door at all hours of the night and there was open prostitution occurring on the property.** I was traveling alone with my teenage daughter and felt extremely unsafe at this location.

This time, Mr. Patel apologized that "people wear [sic] hanging out in the hallway" and said, "I will hire security man for night. i

---

[6] *Id.* (emphasis added).

will make sure it will not happen again."[7]

61.     Other times, Mr. Patel would respond to reviews without mentioning

the respective reviewers' complaints in specific terms. Among the reviews

receiving this kind of general response were:[8]

    a.    An August 29, 2014 review, stating:

> This hotel is unsanitary and a hotbed for criminal activity.  . . . Dirty pillow cases, blood on the floor, bugs, cigarette burns everywhere, **prostitutes, and drug activity right outside our door**, which had no lock because apparently it had been kicked in by the police. The desk clerk couldn't have cared less.

    b.    A September 7, 2014 review, stating:

> **Nothing but a dope and prostitution den!!** The room was nasty. . . . Kind of scary with men hanging out in lobby while checking in.  The parking lot was filled with young people drinking and smoking dope.  I believe it should be condemned! Avoid at all costs.  You would be better off sleeping in your car.

    c.    A second September 17, 2014 review, stating:

> I am in the room right now scared! . . . I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars?  Im a dime baby you no im worth more than that!"  Then the traffic throughout the day . . . . **its a drug and prostitute headquarters.**  Im a young male well over 6ft tall and fear for my safety

---

[7] *Id.* (emphasis added).
[8] *Id.* (emphasis added).

d.   An August 8, 2015 review, stating:

> DO NOT STAY HERE.  Terrible place to stay. . . . Went to get clean towels from desk and was informed I need to go back to my room and bring them my used towels before I could receive new ones. . . . **Prostitutes and drug dealers roam the parking lot.  There are at least 5 people on the parking lot all hours of the night**.[9]

62.   RRI monitored the reviews of the Smyrna Red Roof, including but not limited to Tripadvisor reviews, required the location manager to respond to certain reviews, and used the reviews in its performance metrics.  As a result, RRI knew or should have known of these reviews, the prevalence of crime and prostitution and other indicia of sex trafficking at the Smyrna Red Roof.  Furthermore, as part of its supervision and control of the Smyrna Red Roof, if the manager's resolution is not satisfactory to RRI, RRI will fine the location manager.

63.   RRI employees monitor each hotel.  For the Smyrna Red Roof, those employees included Mr. Moyer, a Vice President of Operations, and Vickie Lam.

64.   On behalf of RRI, Mr. Moyer, Ms. Lam, and others monitored the revenue, occupancy, and online reviews of the Smyrna Red Roof.

---

[9] *Id.* (emphasis added).

65.     RRI employees routinely contacted the employees at the Smyrna Red Roof regarding specific negative online reviews in response to customer complaints.

66.     At one point, a general manager of the Smyrna Red Roof began making more frequent calls to the police and refused to rent rooms to people who appeared to be engaged in suspicious or illegal activity.

67.     In response, RRI and Mr. Moyer told her "you need to sell rooms" and "you need to get your numbers up."

68.     The Smyrna Red Roof security guards frequently hung out with guests who were "partying" outside their rooms, engaging in some of the same activity.

69.     One security employee told one of the Smyrna Red Roof managers that other managers encouraged this type of behavior.

70.     This ineffective security was common during both FMW's and Varahi's ownership of the Smyrna Red Roof.

71.     During the relevant time period, the Smyrna Red Roof Defendants knew or should have known of public statements by city officials in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

72.     The Smyrna Red Roof Defendants knew or should have known of the of End Child Prostitution and Trafficking (ECPAT-USA) and its Tourism Child-Protection Code of Conduct (the "Code") in the United States[10] and of guidance from the Department of Homeland Security ("DHS"), issued in 2010 to hotel companies, that identified a number of warning signs indicating the presence of sex trafficking at hotels.  According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[11]

73.     These facts support an inference that the Smyrna Red Roof Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

## B.     The Smyrna Red Roof Defendants

---

[10] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

[11] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

74.     As further described below, Westmont, RRI, Varahi, FMW, Red Roof

Franchising, RRI West, and the Smyrna Red Roof John Does Nos. 1–10

owned, managed, supervised, operated, oversaw, controlled the operation of,

and were inextricably connected to the renting of rooms at the Smyrna Red

Roof.

75.     Westmont, RRI, Varahi, FMW, Red Roof Franchising, RRI West, and

the Smyrna Red Roof John Does 1–10 each knowingly benefited financially

from the operation of the Smyrna Red Roof, including from the room revenue

generated from Plaintiff's sex trafficking.

          **1.     The Corporate Relationship between Westmont and
               Red Roof Inns, Inc.**

76.     Westmont and RRI jointly own, operate, and profit from hundreds of

Red Roof Inns around the country.  From 2010–2012 the two companies

jointly owned, operated, and profited from the Smyrna Red Roof.

77.     Westmont and RRI are related through a complicated corporate

structure:



78.     Westmont controls separate corporate entities that purchase hotels and then enter franchise agreements (as franchisee) with RRI (as franchisor). Other Westmont-controlled entities jointly manage hotels with RRI, which employs the hotel's staff.

79.     Westmont also owns RRI.  From at least 2010 through 2012 at the Smyrna Red Rood, Westmont was the owner of the real property (the franchisee), entered franchise agreement with RRI, *and* was the owner of RRI.

80.     To own and operate their hotels, Westmont and RRI rely on dozens of other companies of their creation.  These companies exist mostly on paper and do not have their own employees, offices, or operations independent of Westmont and RRI.  Several of these companies—FMW, RRI III, RRI West, Red Roof Franchising—are named Defendants.  The actions and knowledge of FMW, RRI III, RRI West, and Red Roof Franchising are attributable to Westmont and RRI because of the control Westmont and RRI exerted over these companies.



86.     Westmont and RRI jointly controlled the Smyrna Red Roof from 2010 to

December 2012.  Westmont then sold the hotel to Varahi in December 2012

and Westmont-controlled entities were no longer involved at the Smyrna Red

Roof Inn.



### 2.    Owners and Franchisees of the Smyrna Red Roof

87.    FMW was the fee simple owner of the Smyrna Red Roof from 2010 to December 2012.  FMW has no employees or independent business operations but is instead controlled completely by Westmont and RRI.

88.    Varahi bought the Smyrna Red Roof from FMW in December 2012 and is the current fee simple owner of the hotel and franchisee, while RRI is the franchisor.

89.    As owners and franchisees of the Smyrna Red Roof, FMW and Varahi received a percentage of the revenue from the rental of hotel rooms at the Smyrna Red Roof, including the rooms in which Jane Doe 1 was trafficked.

### 3.    Managers of the Smyrna Red Roof

90.    For purposes of managing the Smyrna Red Roof from 2010–2012, Westmont and RRI functioned as a single entity.

27

93.    RRI West has no employees or independent business operations but is instead controlled completely by Westmont.



97.    After December 2012, Varahi employed the staff and managed the day-to-day operations of the Smyrna Red Roof.

### 4.    The Smyrna Red Roof Franchisor

98.    RRI, through Red Roof Franchising, was the franchisor over the Smyrna Red Roof after Varahi bought the hotel.  Red Roof Franchising has no employees or independent business operations but is instead controlled completely by RRI and Westmont, owing to the relationship between those entities described in Part I.B.1., above.

29





31



## II.   THE SUBURBAN EXTENDED STAY

### A.   The Sex Trafficking of Jane Doe 4 at the Suburban Extended Stay

101.   During 2011 to 2012, Jane Doe 4 was trafficked out of hotel rooms at the Suburban Extended Stay, located at 2050 Peachtree Industrial Court, Chamblee, Georgia 30341 ("Suburban Extended Stay").

102.   When she was trafficked out of the Suburban Extended Stay, Jane Doe 4 was forced to have sex with around 10 men per day.  The foot traffic of men to the hotel room in which Jane Doe 4 stayed evidenced trafficking.  Because there she was often in a room with at least one other trafficking victim, the number of men who came and went from the hotel room, each staying for a short period of time, was even greater.

103.   And because Jane Doe 4 was not the only trafficking victim in rooms at the Suburban Extended Stay at that time, there were often even more men: entering the parking lot, going into a room for a short period of time, leaving the room, and then exiting the parking lot.  At a minimum, at least 50 buyers per day came to the Suburban Extended Stay to purchase sex when Jane Doe 4 was trafficked there.

104.   The volume of buyers coming in and out of rooms on a daily basis supported an inference that any commercial sex happening in rooms at the Suburban Extended Stay was not prostitution alone, but instead was sex trafficking as a result of force, fraud or coercion.

33

105.    The illegal commercial sex and trafficking at the Suburban Extended Stay was open and obvious, reinforcing the location's reputation as a hotel that permitted illegal commercial sex and sex trafficking.  Several nonprofit and religious groups routinely visited the Suburban Extended Stay in order to provide food and rescue information to the sex trafficking victims whom these groups knew would be there.

106.    The sex trafficking ventures at the Suburban Extended Stay operated with the knowledge and assistance of Suburban Extended Stay employees, agents, and managers.  Multiple Suburban Extended Stay employees actively assisted Jane Doe 4's trafficker.

107.    Suburban Extended Stay employees also assisted other traffickers, including the trafficker of Jane Doe 1.  Upon arrival at the Suburban Extended Stay, another victim, Jane Doe 2, observed Jane Doe 1's trafficker greet two front desk attendants as if they were friends.  The Suburban Extended Stay employees asked if Jane Doe 1's trafficker wanted to rent a room in the "usual spot."

108.    Jane Doe 1's trafficker responded to the Suburban Extended Stay employees by requesting that "Y'all call that phone if anything crazy is going on.  Look out for my girl here and let me know if she does something crazy." Jane Doe 1's trafficker stated, "Y'all always got my back."

109.   At the Suburban Extended Stay, front desk employees would call the hotel room rented by traffickers, to alert them if there were police at the hotel or if the employees thought that traffic to the room should be slowed.

110.   Similarly, a maintenance worker at the Suburban Extended Stay was both aware of and facilitated trafficking at the location.  After another victim, Jane Doe 2 was left at the location alone for a short time, she approached the maintenance worker for help.  Without a phone, money, or any other means of escape, Jane Doe 2 asked the Suburban Extended Stay maintenance employee to use his cell phone or to give her a ride.  He refused.

111.   Later that day, after Jane Doe 2's trafficker—who was then also trafficking Jane Doe 1—returned, he beat Jane Doe 2, yelling loudly enough for others to hear, "You think somebody is going to help you? None of these people are going to help you."

112.   Following the beating, Jane Doe 2 showed unmistakable signs of her injuries, including redness, bruises, and a swollen and busted lip.  Suburban Extended Stay employees who saw Jane Doe 2 had to have observed these well-known physical indications of her trafficking.

113.   Like Jane Doe 2, Jane Doe 4's physical appearance while being trafficked at the Suburban Extended Stay often confirmed her own abuse: bruises, a busted-lip, or other evidence of physical beatings by her trafficker.

35

Her physical appearance also suggested malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, evidence of deterioration, all well-known signs of trafficking. Her failure to make eye contact with others, lack of control and possession of money, and monitoring by her traffickers also were well-known signs that she was a trafficking victim.

114. The Suburban Extended Stay hotel rooms in which she stayed also showed well-known and visible signs of sex trafficking. The smell of the room reflected the frequent sexual acts, and the trash cans contained an extraordinary number of used condoms—again suggestive of a higher volume of buyers than would be reasonably expected through prostitution alone.

115. The number of cell phones exceeded the number of registered guests in the room.

116. And while staying at the Suburban Extended Stay, Jane Doe 4 frequently requested extra towels, other linens, and a significant volume of other housekeeping items.

117. Jane Doe 4's physical condition and the condition of the room in which she was trafficked was apparent to the employees on-site, at least some of whom worked for Westmont, and to anyone with whom she interacted during her stays on the property.

118.   A Westmont employee reported being aware of sex trafficking occurring at the hotel, witnessed physical assaults of women there, and saw evidence of sexual assaults.

119.   The same Westmont employee was aware of several traffickers operating out of the Suburban Extended Stay who told some hotel staff that the 4–5 victims with each trafficker were their "girlfriends."

120.   The same Westmont employee reported receiving no training regarding safety, security, or the risk of sex trafficking and had no knowledge of other on-site employees receiving such training.

121.   Employees at the Suburban Extended stay were required to send all reports of crime directly to Westmont on a regular basis.

122.   In addition to the obvious signs of sex trafficking ventures operating with impunity at the Suburban Extended Stay, numerous arrests and investigations gave the Suburban Extended Stay knowledge and notice of the foreseeable risk of sex trafficking ventures at the hotel. Such incidents include:

   a.   On July 22, 2010, a 20-year-old was arrested for prostitution and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit. The woman stated she was prostituting to make money for her boyfriend.

37

b.  On April 21, 2011, a 31-year-old was arrested for prostitution at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit.

c.  On June 20, 2012, the Dekalb County Vice Unit conducted an operation at the Suburban Extended Stay solely "to deter prostitution on going [sic] at this hotel." As part of the operation, two individuals, one sex offender, were arrested on drug charges and for failing to register as a sex offender.

d.   On January 2, 2013, a 19-year-old and a 24-year-old were arrested for prostitution and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit.

e.  On January 21, 2014, an 18-year old was arrested for prostitution and a 26-year-old male was arrested for pimping and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit. The 18-year-old stated that she had traveled to Atlanta from Wisconsin to live at the Suburban Extended Stay with the man. At the Suburban Extended Stay, she worked as a prostitute; the man kept half of the proceeds from her prostitution.

123.   These arrests and the volume and type of criminal activity they reflect—relating to prostitution, women being forcibly recruited for prostitution, and men profiting from others' prostitution—at least support an inference that the Suburban Extended Stay Defendants had actual or constructive knowledge of sex trafficking at the location.

124.   As part of the operation and management of the Suburban Extended Stay, the Suburban Extended Stay Defendants actively monitor online customer reviews of the Suburban Extended Stay.  Among the reviews reporting prostitution (which is sex trafficking or is suggestive of sex trafficking) and other crime were:

a.   A review from January 2012 stated,

A place of horror, if you want to know what hell is like stay here. I can understand why there no improvements most of people that **I see are crackheads rough looking thugs or prostitutes and** they don't use computers. front desk is rude, does nothing about putting the customer first. there are always people hanging out in the parking lot full of alcohol no telling what else. you don't go outside at night here for fear of your own safety from the thugs thet make up most of the clients.

b.   A review from August 2012 stated,

lots of people hanging out.. I was in the room for 5 minutes and requested a refund. I'm still waiting on the refund and it has been 2 months. Manger said that she would mail the refund, still waiting. Have spoken with the mangsr several times, still waiting. I think this hotel is a hangout spot for Drug dealers and

Crackheads.

c.    A review from May 2014 stated,

Marijuana Smoke, [. . .] Drug dealers next door, Cops circling the premises, The staff is rude, Cum stained sheets and Telephones with no cords, If you want to live a Herpe, drug free wait, if you just want to LIVE, do not stay here.

d.    A review from June 2014 stated,

Disgusting. Hotel. [. . .] **2 working prostitutes** and many drug dealers. I am stuck here.

e.    A review from June 2014 stated,

Great if your looking for new drug dealers. . . . Getting to sleep at night can be a challenge, especially if you are not comfortable being **surrounded by felons, thieves, drug dealers (the bad drugs to boot) and also prostitutes and some pimps**. If you are a female traveling without a male companion, or if you are not carrying a firearm, it would be foolish to stay here. . . .

f.    A review from June 2015 stated,

The building and surrounding areas aren't much better. The hall ways are dirty, including the elevator which has a broken hand rail. In addition, during our 2 week stay I noticed 4 different police offficers responding to calls in the building. I was also informed by a business owner very similar to the Suburban Extended Stay that the hotel is "ghetto" and is **frequently used for selling drugs and prostitution...** DISGUSTING again!

125.  These reviews and the volume and type of criminal activity they reflect

at a minimum support an inference that the Suburban Extended Stay

defendants had actual or constructive knowledge of various sex and drug crimes happening at the location, including sex trafficking.

126.   During the relevant time period, the Suburban Extended Stay Defendants knew or should have known of public statements by city officials in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

127.   The Suburban Extended Stay Defendants knew or should have known of the of End Child Prostitution and Trafficking (ECPAT-USA) and its Tourism Child-Protection Code of Conduct (the "Code") in the United States[12] and of guidance from the Department of Homeland Security ("DHS") issued in 2010 to hotel companies that identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by

---

[12] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[13]

128.   These facts support an inference that the Suburban Extended Stay Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

### B.   The Suburban Extended Stay Defendants

129.   Westmont—the same Westmont that owns RRI—bought the Suburban Extended Stay in July 2011.  Westmont owned, operated, and managed the hotel along with a franchisor, Choice Hotels.[14]

130.   In connection with the Suburban Extended Stay, Westmont created three other entities, none of whom have employees, offices, or operations independent of Westmont: WHG SU LP, WHG SU LLC, and SUB-SU.

131.   Before Westmont bought the Suburban Extended Stay, HSI, a company unrelated to Westmont, owned the hotel.

---

[13] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

[14] The Suburban Extended Stay where Jane Doe 4 was trafficked is currently a HomeTown Studios hotel, a brand of Red Roof Inns, Inc.  However, during the time of her trafficking, the hotel was a Suburban Extended Stay, a brand of Choice Hotels.

132.   At all relevant times, HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, and Suburban Extended Stay John Does Nos. 1–10 owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Suburban Extended Stay located at the Suburban Extended Stay.

133.   At all relevant times, HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, and the Suburban Extended Stay John Does Nos. 1–10 benefitted financially from the operation of the Suburban Extended Stay, including from the room revenue generated from Plaintiff's sex trafficking.

### 1.   Owners of the Suburban Extended Stay

134.   HSI was the fee simple owner of the Suburban Extended Stay from 1997 to July 2011.

135. WHG SU LLC was the fee simple owner of the Suburban Extended Stay from July 2011 to 2018. WHG SU LLC has no employees or independent business operations but is instead controlled completely by Westmont.



136.   WHG SU Atlanta, LP is the current fee simple owner of the Suburban

Extended Stay since 2018.  Though Westmont has represented in this lawsuit

that these are two different companies, they are, in fact, the same company.

WHG SU LLC converted to WHG SU LP in a July 31, 2018 filing with the

Delaware Division of Corporations.  The two companies filed a name change

with the Georgia Secretary of State on August 2, 2018.  The name change

was signed by Richard Agee, Westmont's Director of Acquisitions and Asset

Management.

137.   On August 10, 2018, WHG SU LP filed an Affidavit Relating to Title that confirmed the name change and affirmed that WHG SU LP was bound by a previous loan which used the Suburban Extended Stay as collateral. This document was signed by Richard Agee and Westmont's Vice President of Finance, Bob Choo.

138.   To the extent they are different companies, WHG SU LP is the successor of WHG SU LLC.  WHG SU LP has no employees or independent business operations but is instead controlled completely by Westmont.

### 2.      Manager of the Suburban Extended Stay

139.   HSI was the manager and operator of the Suburban Extended Stay from 1997–July 2011.  Employees of the Suburban Extended Stay at that time were employed directly by HSI.

140.   Westmont was the manager and operator of the Suburban Extended Stay after July 2011.  Employees of the Suburban Extended Stay were employed directly by Westmont.

141.   As the owner, manager, and employer of staff at the Suburban Extended Stay, Westmont controlled the hotel's day-to-day operation, including, but not limited to,

a.      Employee training, supervision, responsibilities, and termination decisions for every type of employee;

46

b.      Every aspect of employee pay, including setting the amount and scale, reduction in pay policies, and dictating employee hours worked and timekeeping systems employees used;

c.      Regulating vacation, paid holidays, employee discounts, employee leave, employee benefits, and employee discipline;

d.      Housekeeping procedures controlling how to clean a room and how and whether to report safety and security issues;

e.      Safety and security policies and practices for employees to follow;

f.      Hours of operation; and

g.      Fixing prices and discount policies.

## III.   THE MICROTEL INN & SUITES

### A.   The Sex Trafficking of Jane Doe 4 at the Microtel

142.  From 2010 to 2012, Jane Doe 4 was trafficked out of hotel rooms at the Microtel Inn & Suites by Wyndham, located at 1840 Corporate Boulevard NE, Atlanta, Georgia 30329 ("Microtel").  During multiple different stays, Jane Doe 4 was trafficked at the Microtel.

143.  When she was trafficked out of the Microtel, Jane Doe 4 was at times trafficked along with Jane Doe 3 and other trafficking victims.

144.  The volume of foot traffic of buyers to the hotel room in which Jane Doe

4 stayed evidenced trafficking, rather than prostitution alone.  At least 10 men a day came and went from the hotel room, each staying for a short period of time.  Because Jane Doe 4 was often trafficked with more than one person in each hotel room, the foot traffic was even greater.  And because she was not the only trafficking victim in hotel rooms at the Microtel, there were often even more men coming and going from the Microtel for the purpose of purchasing sex.

145.   The illegal commercial sex and trafficking at the Microtel was open and obvious.  The sex trafficking ventures at the Microtel operated with the knowledge and assistance of Microtel employees, agents and managers.  Microtel front desk employees knew of the sex trafficking venture and agreed to act as "look outs" for traffickers, including another victim, Jane Doe 3's trafficker.  Microtel employees routinely called traffickers, to alert them that police were at the Microtel.

146.   Traffickers frequently used the hotel's computer in the lobby to post advertisements online for sex with trafficking victims, including Jane Doe 1 and Jane Doe 2, or traffickers required their victims to post similar advertisements.  The computer was in full view of the lobby and the hotel's employees.  Other traffickers also openly used the hotel's computer for the same purpose.

147.   For several years, including while Plaintiff was trafficked at the Microtel, a single sex trafficker, Quintavious Obie (a/k/a Swazie), completely controlled the third floor of the hotel.  Obie was convicted of sex trafficking in violation of the TVPRA and sentenced to 21 years in prison in *United States v. Obie*, 1:18-cr-0007-ODE.

148.   During this time, Obie lived on the third floor along with multiple relatives and other associates.  Microtel employees only rented rooms on the third floor with Obie's prior permission.

149.   At times, Obie had seven or more victims—several of whom were minors—living on the third floor of the Microtel.  Women being trafficked by Obie each had their own room on the third floor.  If they required another room, for example, to meet a buyer, they only had to go to the front desk and say "[Obie] told me to get another room."  These victims were never required to show identification to get another room and only paid in cash.

150.   Obie also used the banquet room of the Microtel for photo shoots for advertisements to post online for commercial sex at the Microtel.  At least one of these photo shoots was videotaped and the video was posted online.

151.   Obie often walked through the hotel with several women surrounding him.  He was frequently violent with the women trafficked at the hotel.  He was also violent with buyers at the hotel, including beating one man,

49

stripping his clothes off, and making him leave the hotel naked.  These violent incidents were audible and visible to employees at the Microtel.

152.   Microtel housekeeping staff frequently came to the third floor to bring numerous extra towels at the request of trafficking victims.

153.   Like the numerous other trafficking victims who essentially lived at the Microtel, while Jane Doe 4 was trafficked at the Microtel, her outward physical appearance reflected her status as a trafficking victim.  Jane Doe 4 was often covered in bruises or other evidence of physical beatings by her trafficker.  Her physical appearance also suggested malnourishment, poor hygiene, fatigue, sleep deprivation, and evidence of deterioration, all well-known signs of trafficking.  Her failure to make eye contact with others, lack of control and lack of money, and monitoring by her traffickers also were well-known signs in the hotel industry that she was a trafficking victim.

154.   The hotel room in which Jane Doe 4 stayed while being trafficked at the Microtel also showed well-known and visible signs of sex trafficking.  The smell of the room reflected the frequent sexual acts, and the trash cans contained an extraordinary number of used condoms—suggesting a volume of buyers not associated with prostitution alone.

155.   The number of cell phones in the room also exceeded the number of guests registered to the room.

156.   And while staying at the Microtel, Jane Doe 4 frequently requested

extra towels, other linens, and a significant volume of other housekeeping

items.

157.   In addition, numerous reviews of the Microtel—available to the

Microtel Defendants and the general public—reported the presence of pimps

and prostitution (which is sex trafficking or is suggestive of sex trafficking)

at the hotel, including:

   a.   A September 5, 2011 review:
        One morning at 5:00AM two men had a foul-mouthed shouting
        match over a woman and had to be thrown out of the hotel.  We
        suspect this type of behavior is common as the hotel is in close
        proximity to a strip joint and a night club.  **There are many
        different people coming and going at all hours, which we
        makes us suspect prostitution.**  This is the worst experience
        my wife and I have had at a hotel.

   b.   An April 21, 2013 review:
        In operation to service the Pink Pony
        Unfortunately for the normal traveler, this hotel is next to the
        Pink Pony.  During day time hours this isn't such a big deal, but
        if you are trying to leave for a 5 am flight with your three small
        children **and have to wait for the prostitutes to clear the
        hallway .** . . well, it is not exactly a family friendly
        establishment.

   c.   A July 2014 review:
        I want to believe that **some of the stragglers hanging around
        the hotel were pimps & prostitutes.**  Definitely need new
        management there.  I had the room booked for two nights but
        only stayed one due to all this that was going on, Never, ever,

51

ever again would I stay at this hotel. I'm still itching thinking about it!!!

158.   In addition to the obvious signs of sex traffickers operating with impunity at the Microtel, arrests and investigations gave the Microtel knowledge and notice of the foreseeable risk of sex trafficking ventures at the hotel.

159.   Similarly, the volume and type of criminal activity at the Microtel—relating to prostitution, women being forcibly recruited for prostitution, and men profiting from others' prostitution—at a minimum support an inference that the Microtel Defendants had actual or constructive knowledge of sex trafficking at the location.

160.   During the relevant time period, the Microtel Defendants knew or should have known of public statements by city officials in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

161.   The Microtel Defendants knew or should have known of the of End Child Prostitution and Trafficking (ECPAT-USA) and its Tourism Child-Protection Code of Conduct (the "Code") in the United States[15] and of

---

[15] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

guidance from the Department of Homeland Security ("DHS") issued in 2010 to hotel companies that identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[16]

162.   These facts support an inference that the Microtel Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

### B.   The Microtel Defendants

163.   CC&S owns and operates the Microtel.  CC&S created Kuzzins, which has no offices, employees, or operations independent of CC&S, to own the Microtel, but in practice CC&S owned, operated, and managed the hotel with only itself and the franchisor, a Wyndham Hotels entity.

---

[16] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

164.   CC&S hired Essex to manage the Microtel. Essex employed the staff at the hotel, marketed, advertised, and recruited corporate accounts for the hotel, and operated the hotel pursuant to a management agreement with Kuzzins that CC&S signed.  However, CC&S in turn managed even the smallest details of Essex's operations at the Microtel.

165.   Kuzzins, CC&S, Essex, and Microtel John Does Nos. 1–10 (collectively, the "Microtel Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Microtel.

166.   Kuzzins, CC&S, Essex, and Microtel John Does Nos. 1–10 benefitted financially from the operation of the Microtel, including from the room revenue generated from Plaintiff's sex trafficking.



### 1.    Owners of the Microtel

167.   Kuzzins is the fee simple owner of the Microtel.  Kuzzins has no employees or independent business operations but is instead controlled completely by CC&S.

### 2.    Managers of the Microtel

168.   Essex employs the staff at the Microtel and manages the Microtel at the direction of CC&S.

### 3.    The Microtel Defendants are Agents of CC&S

169.   Kuzzins and Essex expressly created an agency relationship via contract in the parties' management agreement for the Microtel. In that management agreement, Kuzzins agreed that "[a]ll debts, obligations and other liabilities incurred by [Essex ] in performance of its duties hereunder shall be incurred on behalf of [Kuzzins]."

170.   Just as Kuzzins is an alter ego of CC&S, Essex is an agent of CC&S in their acts and omissions related to the Microtel.  CC&S recognized its role as principal in this agency relationship through hundreds of emails directing and ratifying Essex's day-to-day activities.

171.   CC&S exercised an ongoing and systemic right of control over Essex and Kuzzins at the Microtel, including exercising control over how Essex and Kuzzins conducted their daily business.  For example, CC&S:

    a.    Explicitly entered an agency relationship with Essex through Kuzzins for Essex's work at the Microtel;

    b.    Directed Essex to provide instruction and receive clearance regarding the details of specific daily tasks such as pressure washing the property, parking lot maintenance, and landscaping;

    c.    Required that individual incidents of crime be reported to CC&S;

    d.    Directed Essex's use of Essex's own funds;

e.    Required approval from CC&S regarding remodeling and maintenance decisions and details, including details such as the height in inches (4 versus 3) of bathroom backsplashes, the thickness of the vanity top, sink dimensions and details, the color of the finish on furniture, among other details;

f.    Instructed Essex on how and how often to supervise specific employees;

g.    Required pre-approval from CC&S for all purchase orders and change orders,

h.    Personally inspected the property and directed Essex to replace specific items such as trash can lids, fix a bolt on an ice machine, and dust behind vending machines;

i.    Controlled the amount of Essex employee pay and bonuses;

j.    Required that personnel files be organized in a specific way;

k.    Closely monitored security protocols and made decisions regarding the use of specific security devices, armed security, and policies and procedures to be enacted by Essex employees at the Microtel.

## COUNTS

## Violations of the Georgia Racketeer Influenced
## and Corrupt Organizations Act
### (Allegations Common to Counts I–II, V–VI, IX–X)

172.   Each Defendant acquired or maintained, directly or indirectly, an interest in money through a pattern of racketeering activity.

### A.   Acts of Racketeering Activity

i.   <u>Sex Trafficking in Violation of Federal Law</u>

173.   As set forth in the Counts below, Defendants have each violated 18 U.S.C. § 1591 by participating in the sex trafficking of Jane Doe 4 and others. This constitutes racketeering activity.

ii.   <u>Sex Trafficking in Violation of State Law</u>

174.   Committing, attempting to commit, and soliciting, coercing, or intimidating another person to commit the crime of trafficking a person for sexual servitude in violation of Georgia law is racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vi); O.C.G.A. § 16-5-46.

175.   A person commits the offense of trafficking an individual for sexual servitude when that person knowingly:

a.   subjects an individual to or maintains an individual in sexual servitude;

      b.     recruits, entices, harbors, transports, provides, solicits,

             patronizes, or obtains by any means an individual for the purpose

             of sexual servitude; or

      c.     benefits financially or by receiving anything of value from the

             sexual servitude of another.

O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(B).

176.  "Sexual Servitude" means any sexually explicit conduct or performance involving sexually explicit conduct that is induced or obtained by coercion or deception and for which anything of value is directly or indirectly given, promised to, or received by any individual.  O.C.G.A § 16-5-46(a)(8)(A).

177.  As alleged above, Jane Doe 4 and other victims were subjected to and maintained in sexual servitude by Defendants, individually, as parties to the crime, and as co-conspirators, in violation of O.C.G.A. § 16-5-46(c)(1), when they were coerced into performing or conducting sexually explicit conduct for which something of value, directly or indirectly, was given, promised to, or received by someone.

178.  Defendants also violated O.C.G.A. § 16-5-46(c)(2) by, individually, as parties to the crime, and as co-conspirators, harboring, recruiting, enticing, transporting, providing, or soliciting Jane Doe 4 and other victims for the purpose of sexual servitude.

179.   Defendants also violated O.C.G.A § 16-5-46(c)(3) by benefitting financially and by receiving things of value from the sexual servitude of Jane Doe 4 and other victims.

180.   Specifically, as alleged above, Jane Doe 4 was <u>trafficked</u> for sexual servitude:

> a.   at the Smyrna Red Roof by the Smyrna Red Roof Defendants— Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—and various traffickers;
>
> b.   at the Suburban Extended Stay by the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—and various traffickers; and
>
> c.   at the Microtel by the Microtel Defendants—Kuzzins, CC&S, and Essex—and various traffickers.

181.   Defendants' agents participated in violations of O.C.G.A. § 16-5-46, alleged above, while acting within the scope of their office or employment and on behalf of Defendants.  The conduct of Defendants' agents constituted a pattern of illegal activity that each Defendant or its agents knew or should have known was occurring.

> iii.   <u>False Imprisonment</u>

182.   Defendants, individually, as parties to the crime and as co-conspirators, also falsely imprisoned Jane Doe 4 and other victims by, as alleged above, confining and detaining them without legal authority, contrary to their will and in violation of their personal liberty, in violation of O.C.G.A. §16-5-41. This constitutes racketeering activity.  O.C.G.A. §§ 16-14-3(5)(A)(vi).

183.   Specifically, as alleged above, Jane Doe 4 was falsely imprisoned:

  a.    at the Smyrna Red Roof by traffickers and the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—acting individually, as parties to the crime, and as co-conspirators;

  b.    at Suburban Extended Stay by traffickers and the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—acting individually, as parties to the crime, and as co-conspirators; and

  c.    at the Microtel by traffickers and the Microtel Defendants—Kuzzins, CC&S, and Essex—acting individually, as parties to the crime, and as co-conspirators.

  iv.   <u>Battery</u>

184.   Traffickers at Defendants' hotels regularly committed the offense of battery, intentionally causing visible bodily harm to their victims, including

61

Jane Doe 4, in violation of O.C.G.A. § 16-5-23.1.  This constitutes

racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(v).  Defendants engaged in

this racketeering activity as parties to the crime and co-conspirators by

alerting traffickers to victims' efforts to escape, refusing to report batteries

committed by traffickers to law enforcement, and permitting traffickers to

remain in their hotels, continue trafficking their victims, and committing

further acts of battery.

v.   <u>Keeping a Place of Prostitution</u>

185.   While Jane Doe 4 and other victims were confined and detained against

their will as alleged above, they were prostituted by being forced to perform

sexual acts in exchange for money or other items of value.

186.   Defendants kept a place of prostitution by, acting individually, as

parties to the crime, and as co-conspirators, while having and exercising

control over the use of a place which offered seclusion and shelter for the

practice of prostitution, knowingly granting and permitting the use of that

location for the purpose of prostitution, in violation of O.C.G.A. § 16-6-10.

This constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vii).

187.  Specifically,

    a.   While the Smyrna Red Roof Defendants—Westmont, RRI,

        Varahi, FMW, Red Roof Franchising, and RRI West—had control

62

over the use of the Smyrna Red Roof, a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

b.   While the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—had control over the use of the Suburban Extended Stay, a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution; and

c.   While the Microtel Defendants—Kuzzins, CC&S, and Essex—had control over the use of the Microtel, a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution.

vi.   <u>Pimping</u>

188.   Defendants engaged in pimping when, individually, as parties to the crime, and as co-conspirators, they knowingly aided and abetted others in the commission of prostitution in violation of O.C.G.A. § 16-6-11(5).  This constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vii).

63

## B.   The Acts of Racketeering Activity Formed a Pattern

189.   Each of the Smyrna Red Roof, Suburban Extended Stay, and Microtel Defendants engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

190.   The acts of racketeering activity were interrelated by distinguishing characteristics and were not isolated incidents.

191.   As to each of the Smyrna Red Roof, Suburban Extended Stay, and Microtel Defendants, the acts of racketeering had the same or similar intents, including but not limited to obtaining money, directly or indirectly, through a pattern of racketeering activity.

192.   As to each of the Smyrna Red Roof, Suburban Extended Stay, and Microtel Defendants, the acts of racketeering had the same or similar results, in that they obtained money or facilitated the obtaining of money, directly or indirectly, through a pattern of racketeering activity.

193.   As to each of the Smyrna Red Roof, Suburban Extended Stay, and Microtel Defendants, the acts of racketeering had the same or similar accomplices, including but not limited to sex traffickers, hotels, hotel management, and hotel chain management.

194.   As to each of the Smyrna Red Roof, Suburban Extended Stay, and Microtel Defendants, the acts of racketeering had the same or similar

victims, including but not limited to Jane Doe 4 and other victims who were forced to engage in sexual acts in exchange for money at Defendants' hotels, were falsely imprisoned at those hotels and were the victim of other acts of racketeering activity committed at those hotels.

195.   As to each of the Smyrna Red Roof, Suburban Extended Stay, and Microtel Defendants, the acts of racketeering had the same or similar methods of commission, including but not limited to harboring, holding, confining, and detaining persons who were forced to engage in sexual acts in exchange for money at Defendants' hotels.

196.   As to each of the Smyrna Red Roof, Suburban Extended Stay, and Microtel Defendants, the acts of racketeering were further interrelated by distinguishing characteristics, including but not limited to:

    a.    warning sex traffickers when law enforcement was present or making inquiries;

    b.    as to each Suburban Extended Stay Defendant warning sex traffickers when victims sought to escape; and

    c.    allowing and assisting traffickers to force persons to perform sex acts in exchange for money on a repeated and ongoing basis.

## COUNT I

## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
## (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)

197.   Jane Doe 4 repeats and incorporates the allegations set forth in Parts I.A.-B. and paragraphs 172–196 above, as if fully set forth herein.

198.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

199.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Smyrna Red Roof Sex Trafficking Conspiracy").

200.   Each of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by

acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

201.   Each of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Smyrna Red Roof Sex Trafficking Conspiracy, including those alleged above.

202.   The acts committed by the participants in the Smyrna Red Roof Sex Trafficking Conspiracy number in the thousands.

203.   The conduct in violation of the Georgia RICO Act in which each Defendant participated by committing an act of racketeering activity or an overt act continued to within five years of the filing of this action.

204.   Upon information and belief, the conduct of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—in violation of O.C.G.A § 16-14-4 has not terminated.

205.   Jane Doe 4 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West.

206.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—are liable to Jane Doe 4 for three times her

damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

207.   The wrongful actions of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

208.   Because the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT II
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a)
### (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)

209.   Jane Doe 4 repeats and incorporates the allegations set forth in Parts I.A.-B. and paragraphs 172–196 above, as if fully set forth herein.

210.   As set forth above in paragraphs 172–196, the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI

West—violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

211.   The conduct in violation of the Georgia RICO Act in which the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—participated continued to within five years of the filing of this action.

212.   Upon information and belief, the conduct of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—in violation of O.C.G.A § 16-14-4 has not terminated.

213.   Jane Doe 4 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—violations of Georgia RICO.

214.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—are liable to Jane Doe 4 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

215.   The wrongful actions of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of

care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

216.   Because the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT III
### TVPRA, 18 U.S.C. § 1595
### (Against Smyrna Red Roof Defendants:  Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)

217.   Plaintiff repeats and incorporates the allegations set forth in Parts I.A.-B., above, as if fully set forth herein.

218.   In violation of 18 U.S.C. § 1595(a), each Smyrna Red Roof Defendant—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—knowingly benefitted from participation in a venture that it knew or should have known engaged in sex trafficking.

### Direct Liability

219.   Each Smyrna Red Roof Defendant—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—is directly liable for its benefit, actual or constructive knowledge, and participation in the sex trafficking ventures at

the Smyrna Red Roof.

220.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Smyrna Red Roof, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

221.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff at the Smyrna Red Roof.

222.   The venture in which the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—participated was in or affecting interstate commerce.

223.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—knew or should have known the venture violated the TVPRA because the Smyrna Red Roof Defendants, their agents and representatives, saw the signs of sex trafficking exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of numerous male buyers to Plaintiff's rooms, and the numerous other victims

71

being trafficked at the hotel.

224. FMW, based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, knew or should have known about sex trafficking ventures at the hotel it owned from 2010 to December 2012. FMW participated in the sex trafficking ventures at the Smyrna Red Roof by providing the venue, the physical location where Plaintiff's sex trafficking was permitted.

225. Varahi has owned and managed the Smyrna Red Roof since December 2012. Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, Varahi knew or should have known about the sex trafficking ventures at the hotel it owned and managed. Varahi participated in the sex trafficking ventures at the Smyrna Red Roof by providing the venue, the physical location where Plaintiff's sex trafficking was permitted, and by renting rooms to sex traffickers for sex trafficking at the Smyrna Red Roof with actual or constructive knowledge.

226. RRI West contracted with FMW to manage the Smyrna Red Roof in exchange for a percentage of the hotel's revenue from at least August 2011 to December 2012. Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI West knew or should have known about the sex trafficking ventures at the Smyrna Red Roof. RRI West participated

in the sex trafficking ventures at the Smyrna Red Roof by managing the property where the trafficking was permitted and by renting rooms to sex traffickers for sex trafficking at the Smyrna Red Roof with actual or constructive knowledge.

227.   From 2010–December 2012, RRI managed the Smyrna Red Roof and employed the staff there.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI knew or should have known about the sex trafficking ventures at the Smyrna Red Roof involving its employees. RRI participated in the sex trafficking ventures at the Smyrna Red Roof by renting rooms to sex traffickers for sex trafficking at the Smyrna Red Roof with actual or constructive knowledge.

228.   From 2010–December 2012, Westmont managed and operated the business of the Smyrna Red Roof.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, Westmont knew or should have known about the sex trafficking ventures at the Smyrna Red Roof it managed and operated.  Westmont participated in the sex trafficking ventures at the Smyrna Red Roof by operating the hotel in such a manner as to permit sex trafficking to occur and by renting rooms to sex traffickers for sex trafficking at the Smyrna Red Roof with actual or constructive knowledge.

229.   Red Roof Franchising contracted with FMW and Varahi via RRI's

franchise agreements. Red Roof Franchising knew or should have known what it contractually obligated itself to know through its franchise agreements. That is, Red Roof Franchising knew or should have known about every safety and security incident occurring on the property because its franchise agreements required franchisees to report every safety and security incident occurring on the property. Further, based on the facts alleged in Parts I.A.–B., above and incorporated here by reference, Red Roof Franchising knew or should have known about the sex trafficking ventures at the Smyrna Red Roof. Red Roof Franchising participated in sex trafficking ventures at the Smyrna Red Roof by permitting and profiting from sex trafficking at the Smyrna Red Roof after it had actual and constructive knowledge of the integral role that sex trafficking played at the hotel.

230. Since December 2012, RRI has been the franchisor at the Smyrna Red Roof. RRI knew or should have known about all safety and security incidents as required by its franchise agreement with Varahi. RRI also knew or should have known about sex trafficking at the hotel—including the trafficking of Jane Doe 4—because the CEO and general counsel of RRI were told directly about that trafficking and RRI's involvement in it. RRI participated in sex trafficking ventures at the Smyrna Red Roof by permitting and profiting from

sex trafficking at the Smyrna Red Roof after it had actual and constructive knowledge of the integral role that sex trafficking played at the hotel.

## Agency Liability

231.   Alternatively, Westmont and RRI are also liable under the TVPRA through their agency relationships with certain other particular Smyrna Red Roof Defendants.

232.   At all times relevant to this lawsuit, FMW and RRI West were in an agency relationship with Westmont.  Westmont exerted complete control over FMW and RRI West.  Westmont directed and at times conducted all the business of FMW and RRI West.  Westmont controlled the means and methods of how FMW and RRI West conducted their daily business.  FMW and RRI West were agents of Westmont.

233.   At all times relevant to this lawsuit, Red Roof Franchising was in an agency relationship with RRI.  RRI exerted complete control over Red Roof Franchising.  RRI directed and at times conducted all the business of Red Roof Franchising.  RRI controlled the means and methods of how Red Roof Franchising conducted its daily business.  Red Roof Franchising was an agent of RRI.

## Alter Ego/Mere Instrumentality

234.   Alternatively, Westmont and RRI are also liable to Plaintiff under the

TVPRA because certain other Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—are alter egos of Westmont and RRI.

235.   At all times relevant to this lawsuit, FMW and RRI West were alter egos of Westmont.  FMW and RRI West were created by Westmont and share the same office as Westmont.  Westmont exerted complete control over FMW and RRI West's finances, policies, and business practices.  Westmont employees conducted all the business of FMW and RRI West.  FMW and RRI West did not have their own employees or operations independent of Westmont.  Westmont controlled the means and methods of how FMW and RRI West conducted their daily business.  Westmont's control over FMW and RRI West was used to allow Westmont to profit from sex trafficking, including Plaintiff's sex trafficking, at the Smyrna Red Roof while attempting to avoid liability for doing so.  Westmont's control of FMW and RRI West, therefore, caused Plaintiff's injuries in this lawsuit.

236.   At all times relevant to this lawsuit, Red Roof Franchising was an alter ego of RRI.  Red Roof Franchising was created by RRI and shares the same office as RRI.  RRI exerted complete control over Red Roof Franchising's finances, policies, and business practices.  RRI employees conducted all the business of Red Roof Franchising.  Red Roof Franchising did not have its own

employees or operations independent of RRI.  RRI controlled the means and methods of how Red Roof Franchising conducted its daily business.  RRI's control over Red Roof Franchising was used to allow RRI to profit from sex trafficking, including Plaintiff's sex trafficking, at the Smyrna Red Roof while attempting to avoid liability for doing so.  RRI's control of Red Roof Franchising, therefore, caused Plaintiff's injuries in this lawsuit.

## Joint Venture

237.   Alternatively, Westmont and RRI are also liable to Plaintiff under the TVPRA because they were in a joint venture at the Smyrna Red Roof and each is liable for the acts and omissions of the other.

238.   Westmont is the owner of RRI.  The two companies are interrelated and share employees and operations.  The two companies are even further integrated in situations where Westmont is the owner of a hotel property that is then franchised through RRI.  That was the case at the Smyrna Red Roof from 2010 through December 2012.

239.   From at least 2010 through December 2012, the Smyrna Red Roof was a joint undertaking for profit by Westmont and RRI.

240.   From at least 2010 through December 2012, Westmont and RRI each exerted control over, and each had a right of control over, the Smyrna Red Roof.

241. Westmont and RRI have joint proprietary interests in the Smyrna Red Roof and each share in the profits and losses of the hotel.

242. On information and belief, Westmont and RRI have common stock ownership, common directors and officers, common business departments, share each other's property as their own; and their daily operations are not kept separate.

## Damages

243. Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Smyrna Red Roof Defendants' conduct—that of Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—and their participation in the sex trafficking ventures at the Smyrna Red Roof.

244. The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

245. All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT IV
### Negligence
### (Against the Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)

246.   Jane Doe 4 repeats and incorporates the allegations set forth in Part I.A.-B., above, as if fully set forth herein.

247.   At all relevant times, the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—controlled the operation and management of Smyrna Red Roof, and had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees, including Plaintiff.  The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—breached their duty and failed to act as similarly situated businesses would in similar circumstances.

248.   At all relevant times, the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Smyrna Red Roof.

249.   At all relevant times, Jane Doe 4 was an invitee of the Smyrna Red Roof and the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—owed a duty of care to their invitees,

including Jane Doe 4, to keep the Smyrna Red Roof safe from unlawful acts on the premises.

250.   The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—negligently failed to keep the Smyrna Red Roof safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 4, in breach of their duty of care.  The Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—were negligent, and their negligence proximately caused Plaintiff injuries by:

   a.   Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

   b.   Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

   c.   Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotel;

   d.   Negligently failing to properly inspect and maintain the premises;

   e.   Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

   f.   Negligently failing to properly retain, hire, train, and supervise

80

said employees;

g.    Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.    Negligently failing to inspect, patrol, or appropriately monitor the property;

i.    Negligently failing to remediate a long history of crime at the Smyrna Red Roof and the area nearby;

j.    Negligently failing to warn invitees of known hazards at the property; and

k.    Negligently representing to invitees that the property was safe.

251.  FMW had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, FMW had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite its actual and constructive knowledge, FMW negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

252.  Varahi had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, Varahi had knowledge of, or in the exercise of

81

reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite its actual and constructive knowledge, Varahi negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

253.   RRI West had a duty to keep the premises safe for guests and invitees, including Jane Doe 4, during the time it was the property manager at the Smyrna Red Roof.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI West had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite its actual and constructive knowledge, RRI West negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

254.   Westmont had a duty to keep the premises safe for guests and invitees, including Jane Doe 4 while it was the manager and operator of the Smyrna Red Roof from 2010–2012.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, Westmont had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite its actual and constructive knowledge, Westmont negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

255.   Red Roof Franchising had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, Red Roof Franchising had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof because reporting of sex trafficking was required under the franchise agreement. Despite its actual and constructive knowledge, Red Roof Franchising negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

256.   RRI had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof, including actual specific knowledge of Jane Doe 4's trafficker operating out of the Smyrna Red Roof.  Despite its actual and constructive knowledge, RRI negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

257.   Alternatively, Westmont and RRI are also liable in negligence to Plaintiff under three distinct theories: (1) Agency; (2) Alter Ego; (3) Joint

Venture.  Plaintiff Jane Doe 4 repeats and incorporates the allegations set forth in paragraphs 231 to 242 above, as if fully set forth herein.

258.   As a direct and proximate result of the actions and/or inactions of Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—Jane Doe 4 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

259.   The wrongful actions of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

260.   Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

261.   The actions of the Smyrna Red Roof Defendants—Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West—evidence a species of

bad faith, were and are stubbornly litigious, and have caused Plaintiff undue

expense. Thus, Plaintiff is entitled to recover the necessary expenses of

litigation, including an award of reasonable attorney's fees and expenses

required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-

11-68(e), as well as any other statutory or common law basis.

## COUNT V

### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)

262.   Jane Doe 4 repeats and incorporates the allegations set forth in Part

II.A.-B. and paragraphs 172–196 above, as if fully set forth herein.

263.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU

LP, WHG SU LLC, and SUB-SU—violated O.C.G.A. § 16-14-4(c) by

conspiring to acquire money through a pattern of racketeering activity in

violation of O.C.G.A. § 16-14-4(a).

264.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU

LP, WHG SU LLC, and SUB-SU—knowingly and willfully joined a

conspiracy which contained a common plan or purpose to commit two or more

acts of racketeering activity, through which an interest in and control of

money would be acquired and maintained, either directly or indirectly (the "Suburban Extended Stay Sex Trafficking Conspiracy").

265.   Each of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

266.   Each of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Suburban Extended Stay Sex Trafficking Conspiracy, including those alleged above.

267.   The acts committed by the participants in the Suburban Extended Stay Sex Trafficking Conspiracy number in the thousands.

268.   The conduct in violation of the Georgia RICO Act in which the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—participated continued to within five years of the filing of this action.

269.   Upon information and belief, the conduct of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—in violation of O.C.G.A § 16-14-4 has not terminated.

270.   Jane Doe 4 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO by the Suburban Extended Stay Defendants— HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU.

271.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—are liable to Jane Doe 4 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

272.   The wrongful actions of the Suburban Extended Stay Defendants— HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

273.   Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT VI

### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)

274.   Jane Doe 4 repeats and incorporates the allegations set forth in Part II.A.-B. and paragraphs 172–196 above, as if fully set forth herein.

275.   As set forth in paragraphs 172–196 above, the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

276.   The conduct in violation of the Georgia RICO Act in which the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—participated continued to within five years of the filing of this action.

277.   Upon information and belief, the conduct of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—in violation of O.C.G.A. § 16-14-4 has not terminated.

278.   Jane Doe 4 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the

Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—violations of Georgia RICO.

279.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—are liable to Jane Doe 4 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

280.   The wrongful actions of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

281.   Because the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT VII
## TVPRA, 18 U.S.C. § 1595
### (Against Suburban Extended Stay Defendants:  HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)

282.   Plaintiff repeats and incorporates the allegations set forth in Part II.A.-

B. above, as if fully set forth herein.

283.   In violation of 18 U.S.C. § 1595(a), each Suburban Extended Stay Defendant—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU— knowingly benefitted from participation in a venture that it knew or should have known engaged in sex trafficking.

## Direct Liability

284.   Each Suburban Extended Stay Defendant, HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, is directly liable for its knowing benefit, actual or constructive knowledge, and participation in the sex trafficking ventures at the Suburban Extended Stay.

285.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Suburban Extended Stay, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

286.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff

at the Suburban Extended Stay.

287.  The venture in which the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU—participated was in or affecting interstate commerce.

288.  The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—knew or should have known the venture violated the TVPRA because the Suburban Extended Stay Defendants, their agents and representatives, saw the signs of sex trafficking exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of male buyers to Plaintiff's rooms, and the numerous other victims being trafficked at the hotel.

289.  Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, HSI knew or should have known about sex trafficking ventures at the hotel it owned.  HSI participated in the sex trafficking ventures at the Suburban Extended Stay by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

290.  Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, WHG SU LLC and its successor WHG SU LP, knew or should have known about sex trafficking ventures at the hotel they owned. WHG SU LLC and its successor WHG SU LP participated in the sex

trafficking ventures at the Suburban Extended Stay by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

291. As the general partner of WHG SU LP, SUB-SU is liable for the debts and liabilities of WHG SU LP, which itself is liable as a successor of WHG SU LLC.

292. Westmont managed the Suburban Extended Stay and employed the staff there. Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, Westmont knew or should have known about the sex trafficking ventures at the Suburban Extended Stay. Westmont participated in the sex trafficking ventures at the Suburban Extended Stay by managing the property in such a manner as to permit sex trafficking to occur and by renting rooms to sex traffickers for sex trafficking at the Suburban Extended Stay with actual or constructive knowledge.

**Agency and Alter Ego**

293. Alternatively, Westmont is also liable to Plaintiff under the TVPRA under two other distinct theories: (1) Agency; and (2) Alter Ego.

294. At all times relevant to this lawsuit, WHG SU LP, WHG SU LLC, and SUB-SU were in agency relationships with Westmont. Westmont exerted complete control over WHG SU LP, WHG SU LLC, and SUB-SU. Westmont directed and conducted all the business of WHG SU LP, WHG SU LLC, and

SUB-SU.  Westmont controlled the means and methods of how WHG SU LP, WHG SU LLC, and SUB-SU conducted their daily business.  WHG SU LP, WHG SU LLC, and SUB-SU were agents of Westmont.

295.   At all times relevant to this lawsuit, WHG SU LP, WHG SU LLC, and SUB-SU were alter egos of Westmont.  WHG SU LP, WHG SU LLC, and SUB-SU were created by Westmont and share the same office as Westmont. Westmont exerts complete control over WHG SU LP's, WHG SU LLC's, and SUB-SU's finances, policies, and business practices.  Westmont employees conduct all the business of WHG SU LP, WHG SU LLC, and SUB-SU.  WHG SU LP, WHG SU LLC, and SUB-SU did not have their own employees or operations independent of Westmont.  Westmont controlled the means and methods of how WHG SU LP, WHG SU LLC, and SUB-SU conducted their daily business.  Westmont's control over WHG SU LP, WHG SU LLC, and SUB-SU was used to allow Westmont to profit from sex trafficking, including Plaintiff's sex trafficking, at the Suburban Extended Stay while attempting to avoid liability for doing so.  Westmont's control of WHG SU LP, WHG SU LLC, and SUB-SU, therefore, caused Plaintiff's injuries in this lawsuit.

**Damages**

296.   Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban

93

Extended Stay Defendants', HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, participation in the sex trafficking ventures at the Suburban Extended Stay.

297.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

298.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT VIII
### Negligence
### (Against the Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)

299.   Jane Doe 4 repeats and incorporates the allegations set forth in Parts II.A–B., above as if fully set forth herein.

300.   At all relevant times, the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—controlled the operation and management of the Suburban Extended Stay and had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees, including Plaintiff.  The Suburban Extended Stay Defendants breached their duty and failed to act as similarly situated businesses would

94

in similar circumstances.

301.  At all relevant times, the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Suburban Extended Stay.

302.  At all relevant times, Jane Doe 4 was an invitee of the Suburban Extended Stay and the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—owed a duty of care to their invitees, including Jane Doe 4, to keep the Suburban Extended Stay safe from unlawful acts on the premises.

303.  The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—negligently failed to keep the Suburban Extended Stay safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 4, in breach of their duty of care.  The Suburban Extended Stay Defendants were negligent, and their negligence proximately caused Plaintiff injuries by:

 a. Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

 b. Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

c.     Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotel;

d.     Negligently failing to properly inspect and maintain the premises;

e.     Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f.     Negligently failing to properly retain, hire, train, and supervise said employees;

g.     Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.     Negligently failing to inspect, patrol, or appropriately monitor the property;

i.     Negligently failing to remediate a long history of crime at the Suburban Extended Stay and the area nearby;

j.     Negligently failing to warn invitees of known hazards at the property; and

k.     Negligently representing to invitees that the property was safe.

304.  Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, HSI had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  HSI had knowledge of, or in the exercise of

96

reasonable care should have had knowledge of the threat of sex trafficking at the Suburban Extended Stay Inn.  Despite its actual and constructive knowledge, HSI negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

305.   Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, WHG SU LLC had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  WHG SU LLC had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Suburban Extended Stay Inn.  Despite its actual and constructive knowledge, WHG SU LLC negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

306.   Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, WHG SU LLC and its successor WHG SU LP, knew or should have known about sex trafficking ventures at the hotel they owned. WHG SU LLC and its successor WHG SU LP participated in the sex trafficking ventures at the Suburban Extended Stay by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

307.   As the general partner of WHG SU LP, SUB-SU is liable for the debts and liabilities of WHG SU LP, which itself is liable as a successor of WHG SU LLC.

308.   Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, Westmont had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  Westmont had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Suburban Extended Stay Inn.  Despite its actual and constructive knowledge, Westmont negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

309.   Alternatively, Westmont is also liable in negligence to Plaintiff under two other distinct theories of liability: (1) Agency; and (2) Alter Ego.  In support of those theories of liability, Plaintiff Jane Doe 4 repeats and incorporates the allegations set forth in paragraphs 294 to 296 above as if fully set forth herein.

310.   As a direct and proximate result of the actions and/or inactions of Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—Jane Doe 4 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

311.   The wrongful actions of the Suburban Extended Stay Defendants— HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire

want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

312.   Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

313.   The Suburban Extended Stay Defendants', HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

## COUNT IX
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Microtel Defendants: Kuzzins, CC&S, and Essex)

314.   Jane Doe 4 repeats and incorporates the allegations set forth in Parts III.A.-B. and paragraphs 172–196 above, as if fully set forth herein.

315.   The Microtel Defendants—Kuzzins, CC&S, and Essex—violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

316.   The Microtel Defendants—Kuzzins, CC&S, and Essex—knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Microtel Sex Trafficking Conspiracy").

317.   Each of the Microtel Defendants—Kuzzins, CC&S, and Essex—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

318.   Each of the Microtel Defendants—Kuzzins, CC&S, and Essex— committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Microtel Sex Trafficking Conspiracy, including those alleged above.

319.   The acts committed by the participants in the Microtel Sex Trafficking Conspiracy number in the thousands.

320.   The conduct in violation of the Georgia RICO Act in which the Microtel Defendants—Kuzzins, CC&S, and Essex—participated continued to within five years of the filing of this action.

321.   Upon information and belief, the conduct of the Microtel Defendants—Kuzzins, CC&S, and Essex—in violation of O.C.G.A. § 16-14-4 has not terminated.

322.   Jane Doe 4 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Microtel Defendants—Kuzzins, CC&S, and Essex.

323.   The Microtel Defendants—Kuzzins, CC&S, and Essex—are liable to Jane Doe 4 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

324.   The wrongful actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

325.   Because the Microtel Defendants—Kuzzins, CC&S, and Essex—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### COUNT X
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Microtel Defendants: Kuzzins, CC&S, and Essex)

326.   Jane Doe 4 repeats and incorporates the allegations set forth in Parts III.A.-B. and paragraphs 172–196 above, above as if fully set forth herein.

327.   As set forth above in paragraphs 172–196, the Microtel Defendants—Kuzzins, CC&S, and Essex—violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

328.   The conduct in violation of the Georgia RICO Act in which the Microtel Defendants—Kuzzins, CC&S, and Essex—participated continued to within five years of the filing of this action.

329.   Upon information and belief, the conduct of the Microtel Defendants—Kuzzins, CC&S, and Essex—in violation of O.C.G.A § 16-14-4 has not terminated.

330.   Jane Doe 4 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the

violations of Georgia RICO committed by the Microtel Defendants—Kuzzins, CC&S, and Essex.

331.   The Microtel Defendants—Kuzzins, CC&S, and Essex—are liable to Jane Doe 4 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

332.   The wrongful actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

333.   Because the Microtel Defendants—Kuzzins, CC&S, and Essex—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT XI
## TVPRA, 18 U.S.C. § 1595
### (Against Microtel Defendants:  Kuzzins, CC&S, and Essex)

334.   Plaintiff repeats and incorporates the allegations set forth in Parts III.A.-B. above, as if fully set forth herein.

335.   In violation of 18 U.S.C. § 1595(a), each Microtel Defendant, Kuzzins, CC&S, ESSEX, knowingly benefitted from participation in a venture that it knew or should have known engaged in sex trafficking.

**Direct Liability**

336.   Each Microtel Defendant—Kuzzins, CC&S, and Essex—is directly liable for its knowing benefit, actual or constructive knowledge, and participation in the sex trafficking ventures at the Microtel.

337.   The Microtel Defendants—Kuzzins, CC&S, and Essex—knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Microtel, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

338.   The Microtel Defendants—Kuzzins, CC&S, and Essex—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff at the Microtel.

339.   The venture in which the Microtel Defendants—Kuzzins, CC&S, and Essex—participated was in or affecting interstate commerce.

340.   The Microtel Defendants—Kuzzins, CC&S, and Essex—knew or should have known the venture violated the TVPRA because the Microtel Defendants, their agents and representatives, saw the signs of sex trafficking exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of numerous male buyers to Plaintiff's rooms, and the

104

numerous other victims being trafficked at the hotel.

341.   Based on the facts alleged in Parts III.A.-B. above, and incorporated here by reference, Kuzzins knew or should have known about sex trafficking ventures at the hotel it owned.  Kuzzins participated in the sex trafficking ventures at the Microtel by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

342.   Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, CC&S knew or should have known about sex trafficking ventures at the hotel.  CC&S participated in the sex trafficking ventures at the Microtel by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

343.   Essex managed the Microtel and employed the staff there.  Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, Essex knew or should have known about the sex trafficking ventures at the Microtel.  Essex participated in the sex trafficking ventures at the Microtel by managing the property in such a manner as to permit sex trafficking to occur and by renting rooms to sex traffickers for sex trafficking at the Microtel with actual or constructive knowledge.

**Agency and Alter Ego**

344.   Alternatively, CC&S and Kuzzins are also liable to Plaintiff under the TVPRA under two other distinct theories: (1) Agency; and (2) Alter Ego.

345.   At all times relevant to this lawsuit, Kuzzins was in agency relationships with CC&S.  CC&S exerted complete control over Kuzzins. CC&S directed and conducted all the business of Kuzzins.  CC&S controlled the means and methods of how Kuzzins conducted its daily business. Kuzzins was an agent of CC&S.

346.   At all times relevant to this lawsuit, Kuzzins was an alter ego of CC&S. Kuzzins was created by CC&S and shares the same office as CC&S.  CC&S exerts complete control over Kuzzins's finances, policies, and business practices.  CC&S employees conduct all the business of Kuzzins.  Kuzzins does not have its own employees or operations independent of CC&S.  CC&S controlled the means and methods of how Kuzzins conducted its daily business.  CC&S's control over Kuzzins was used to allow CC&S to profit from sex trafficking, including Plaintiff's sex trafficking, at the Microtel while attempting to avoid liability for doing so.  CC&S's control of Kuzzins, therefore, caused Plaintiff's injuries in this lawsuit.

347.  Essex is also an agent of Kuzzins.  Kuzzins and Essex expressly created an agency relationship via contract in the parties' management agreement for the Microtel.

106

**Damages**

348.   Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the participation of the Microtel Defendants—Kuzzins, CC&S, and Essex—in the sex trafficking ventures at the Microtel.

349.   The Microtel Defendants—Kuzzins, CC&S, and Essex—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

350.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

**COUNT XII**

**Negligence**
**(Against the Microtel Defendants: Kuzzins, CC&S, and Essex)**

351.   Jane Doe 4 repeats and incorporates the allegations set forth in paragraphs Parts III.A.-B. above, above as if fully set forth herein.

352.   At all relevant times, the Microtel Defendants—Kuzzins, CC&S, and Essex—controlled the operation and management of the Microtel and had the legal duty to keep the premises safe and secure with the due regard for the safety of their invitees, including Plaintiff.  The Microtel Defendants breached their duty and failed to act as similarly situated businesses would

107

in similar circumstances.

353.   At all relevant times, the Microtel Defendants—Kuzzins, CC&S, and Essex—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Microtel.

354.   At all relevant times, Jane Doe 4 was an invitee of the Microtel and the Microtel Defendants—Kuzzins, CC&S, and Essex—owed a duty of care to their invitees, including Jane Doe 4, to keep the Microtel safe from unlawful acts on the premises.

355.   The Microtel Defendants—Kuzzins, CC&S, and Essex—negligently failed to keep the Microtel safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 4, in breach of their duty of care.  The Microtel Defendants—Kuzzins, CC&S, and Essex—were negligent, and their negligence proximately caused Plaintiff injuries by:

    a.    Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

    b.    Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

    c.    Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotel;

108

d.   Negligently failing to properly inspect and maintain the premises;

e.   Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f.   Negligently failing to properly retain, hire, train, and supervise said employees;

g.   Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.   Negligently failing to inspect, patrol, or appropriately monitor the property;

i.   Negligently failing to remediate a long history of crime at the Microtel and the area nearby;

j.   Negligently failing to warn invitees of known hazards at the property; and

k.   Negligently representing to invitees that the property was safe.

356.   Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, Kuzzins had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  Kuzzins had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Microtel.  Despite its actual and constructive knowledge,

Kuzzins negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

357.    Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, CC&S had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  CC&S had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Microtel.  Despite its actual and constructive knowledge, CC&S negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

358.    Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, Essex had a duty to keep the premises safe for guests and invitees, including Jane Doe 4.  Essex had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Microtel.  Despite its actual and constructive knowledge, Essex negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

359.    Alternatively, CC&S and Kuzzins are also liable in negligence to Plaintiff under two other distinct theories of liability: (1) Agency; and (2) Alter Ego.  In support of those theories of liability, Plaintiff Jane Doe 4

repeats and incorporates the allegations set forth in paragraphs 345 to 349 above, as if fully set forth herein.

360.   As a direct and proximate result of the actions and/or inactions of the Microtel Defendants—Kuzzins, CC&S, and Essex—Jane Doe 4 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

361.   The wrongful actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 4 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

362.   Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

363.   The actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's

111

fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11

and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law

basis.

Respectfully Submitted this 8th day of May, 2020.

*/s/ John E. Floyd*
John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Manoj S. Varghese
Georgia Bar No. 734668
varghese@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykketlvedt@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com
Michael R. Baumrind
Georgia Bar No. 960296
baumrind@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, Georgia 30309
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Patrick J. McDonough
Georgia Bar No. 489855

112

pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia Bar No. 140808
thundred@atclawfirm.com

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

*Attorneys for Plaintiff Jane Doe 4*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2020, the foregoing SECOND AMENDED

COMPLAINT was filed with the Clerk of Court using the EM/ECF system

which will send e-mail notification to all counsel of record.

This 8th day of May 2020.

/s/ John E. Floyd
John E. Floyd
Georgia Bar No. 266413

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, GA 30309
(404) 881-4100- Telephone
(404) 881-4111 – Facsimile

114